A. David Benjamin, J.
The above-captioned proceedings are distinct and separate matters, each pertaining to the estate of a particular incompetent, and bearing no relationship one to the other. They are, however, considered here together for convenience, since in each of them a motion for reargument and renewal was made by counsel (the same one in all three proceedings), seeking identical relief in all three of these matters, to wit: an increase in the quantum of the fees allowed him on *937 three certain applications, one in each of these estates, as more fully hereinafter detailed. Counsel, as petitioner, when reargument and renewal was denied by this court, thereafter and in all three of these applications appealed to the Appellate Division, Second Department, from this court’s determinations. The Appellate Division in similar decisions (18 A D 2d 1097), remitted them to this court “ for a fuller statement of the reasons for the position taken by the Special Term, and for reconsideration and a determination de novo.”
In compliance with the decisions of the Appellate Division, petitioner counsel was offered an opportunity to file additional papers and to appear and argue the matter de novo. He thereafter advised the court by letter dated June 11, 1963 that he preferred to submit on the original papers and without further oral argument. He did provide the court with a copy of the brief supplied to the Appellate Division by him.
In view of the identity of the issues raised in all three of these applications, this decision is determinative of and applicable to all of them alike. However, separate orders properly encaptioned, embodying the terms of this decision, should be submitted.
None of the matters as originally presented to this court were in any sense controversial. The proceedings on the return dates of the applications were pro forma and took but little time.
The facts in each are as follows:
In the first-captioned matter, this attorney made a purely routine application, unopposed, on behalf of the committee, for leave to make certain payouts from the funds possessed by the incompetent. As was customary and usual in such a minor and simple everyday application, the attorney was granted a fee of $25. Fees in such matters customarily do not exceed $35. Dissatisfied, he moved for reargument and renewal asserting that his services were well worth $175. When reargument was denied, he appealed from this court’s determination, over the strenuous objections to such course by the committee for the incompetent, who opposed the appeal on the ground that it was without merit and against the best interests of the incompetent who, in fact, was this attorney’s' client.
In the second-captioned matter, counsel represented another committee, in an estate which consists solely of Totten trusts as set up by the incompetent prior to her adjudication as such, and of the approximate value of $8,000. That incompetent being in need of funds, this attorney in an application not complex, orthodox and usual in all respects, sought leave to invade the corpus of these tentative trusts for the stated purposes. On *938 the hearing before the court, the committee was permitted to withdraw only $1,000 from the Totten trust accounts in order to preserve the incompetent’s modest estate since this sum was presently sufficient, and a greater withdrawal, when not needed, would necessarily he prejudicial to the named beneficiary of the tentative trusts. For the routine services so rendered, the attorney was awarded $65. Again, counsel moved for reargument and renewal, claiming that his services were of the value of $250, regardless of the modest worth of the estate and the minor services provided. Here as well, upon denial of reargument, he appealed the quantum of the allowance made him, again ignoring the emphatic disapproval of that committee to the action taken by him.
In the last-captioned matter the attorney appeared for a third committee. For his services in preparing the annual inventory for that committee (it should be noted that the annual account such as the one here considered is frequently prepared by committees themselves without the aid of counsel) as examined by the Official Referee in incompetency, he was allowed the fee of $100, the usual and customary amount fixed in schedules set up for this express purpose, in effect for years, and of which schedules and the amounts therein set forth this counsel was well aware, as he was also aware of the fact that the order approving such annual inventories of committees is prepared by the Official Referee in incompetency and not by counsel. Again, dissatisfied with the fees allowed, he moved as heretofore in the other proceedings claiming that in this most typical of usual and routine accounts his services, were worth $275, far in excess of the amounts allotted in the schedules and regularly allowed and awarded in many hundreds of similar applications. Here, too, he appealed.
In the Appellate Division the committees were not represented by counsel inasmuch as this attorney appeared in that court only in furtherance of his own purposes. The record, however, does show that two of these committees communicated with the Appellate Division by letter advising the Justices thereof that the appeals so taken were unauthorized by them and were contrary to their express instructions. They also set forth their opinions that the. fees allowed by this court to this attorney were in all respects adequate.
The fees complained of were, as previously stated, fixed in amounts sufficient to compensate this attorney for the. routine services in these three ordinary and commonplace applications. The sums awarded were in the existing pattern and similar to *939 those allowed in many hundreds of other orders prior to and during this Justice’s assignment by the Appellate Division to this Special Term, and are generally in complete conformity with existing standards as heretofore fixed as well as presently applied, in all similar Special Terms throughout the Second Judicial Department for like services.
Since the Appellate Division in its decisions has asked this court to advise it of its rationale in fixing these fees, it becomes necessary to go beyond the foregoing in amplification of the basis for the making of these customary allowances.
Many counsel representing banks, trust companies, trustees, and committees generally apply for and receive like fees, without objection, and in many instances specifically request fees limited to such amounts and, indeed, often ask for lesser sums. Many other attorneys waive these minor fees entirely.
These adequate fees allowed on minor motions and commonplace ex parte applications are wholly peripheral to the mainstream of professional compensation in these incompetency estates and constitute no important factor of the professional economics involved in the administration of incompetents’ estates. The substantial fees allowed by this court in the administration of all of the estates over which it has jurisdiction stem from the mainstream of services rendered for them. These include fees paid on the origination of an estate where jury trials are had, fees paid upon intermediate and final accountings, fees paid in connection with a sale of real properties owned by incompetents, and most importantly, fees paid for bringing into these estates assets, previously diverted from them or resulting from legal actions brought for the benefit of the incompetents.
It is a genuine disservice to the courts generally, therefore, to attempt to create a false image of inadequate professional economics in these trust estates by suggesting that the modest fees granted on pro forma applications of all types are reflective and representative of the total quantum of compensation allowed for the entire legal management of the estates administered.
Of the 2,700 estates with which this court is charged, many pose serious sociological and economic problems. Fully one half of them are less than $5,000 in total amount. Their administration is largely a public duty to safeguard what amounts to the equivalent of a “ widow’s mite ”, for these unfortunate and ill people to whom even these minor sums become of major significance when they are fortunate enough to be able to leave the institutions and resume their normal places in society. *940 Under such circumstances, it becomes important to have these small estates administered by committees and counsel motivated by a sense of compassion and responsibility for these sick people with a feeling of concern for their economic and custodial welfare.
It is therefore quite clear that a lucrative field for professional employment does not exist in the minor estates. However, since the servicing of accounts of this character is nevertheless essential, this court in administering those estates in which this court designated the committees, attempts to and does create a balanced portfolio for attorneys to enable them and this instant petitioner to handle all of the matters entrusted to them upon sound and reasonable economic bases for the totality of the work performed by them in all of the estates entrusted to them by this court. An examination of the records indicates that in but little more than a year this attorney was allowed by this court not less than $6,000 in legal fees for services rendered by him in the various estates, in addition to which it should be noted that he has earned other fees not as yet allotted to him. In addition, this court, bearing in mind that petitioner renders service in pro forma applications such as the ones now in question, was pleased to designate him as special guardian in other matters for which additional fees were allowed.
Petitioner has sought to create an impression in these applications and on the appeals therefrom that this court is niggardly and unmindful of its obligations to compensate properly on these minor applications. He attempted to justify his contentions by clocking the hours spent on these minimal applications and by enumerating the number of onion skin sheets consumed on the instant motions, while failing, however, to disclose the very substantial fees received in other aspects of the administration of these many estates as hereinbefore set forth. Such a distortion of presentation appears to this court to be less than properly gracious.
The test of the value of legal services involves many factors. In Matter of Snell (17 A D 2d 490), the criteria are listed as: the nature and complexity of the services, results achieved, amounts involved, standing of counsel, as well as the over-all size of the estates in question.
The court there at page 494 stated: ‘ ‘ The timeeloek approach, however necessary or appropriate in some fields, is, most certainly, not that to be exclusively employed in the case of high professional skills directed to complex problems involving, among many other factors, the acceptance of heavy responsibil *941 ity, commensurate with the subject of the retainer, and the utilization of advanced education and long experience.”
The services rendered in the instant application certainly under the tests enumerated in Snell (supra), do not call for substantial remuneration. No special skills were here required, no major talents involved, nor were any complex and time consuming problems presented. Indeed, the applications could have been handled with equal dispatch and diligence by any junior or newly admitted attorney. To employ the timecloek method alone as the test for legal services, as suggested by petitioner, would certainly be improper and result in completely inadequate fees in large estates and disproportionately high fees in modest ones.
While no attorney is required to accept a retainer beneath his professional dignity and standing and which will not earn for him the scale of fees which he demands for himself, it is of moment to note that there is no unwillingness on the part of most attorneys of the highest standing at the Bar, indeed, a readiness, to appear for the most indigent of these mentally ill people, activated by the all-pervading sense of social duty for which the Bar generally is noted and for which they make such genuine sacrifices in time and services in both criminal and civil matters as well. All proper minded persons agree that the administration of these estates is designed to further the needs of the incompetents and their families and is not intended primarily to enrich the administrators of them.
The trust involved is sacred. It is not even a voluntary one on the part of these unfortunates. It comes to us under the legislative mandate to safeguard the holdings of these sick and distressed people who are unable to care for themselves, who are not even aware of the identity and character of the fiduciary responsibilities being carried out on their behalf and who can have, therefore, no hand in the selection of those who are safeguarding their funds. The unilateral imposition of the trust relationship carries with it a special responsibility to acquit these trusts with dignity and honor and to avoid the liquidations of the estates through inordinate administrative costs. We may not risk adverse results upon a person discharged from an institution if we hand to that person, emerging with new hope, a handful of receipts for moneys expended from his estate rather than a check for the sums which came into our trust.
It is apparent, therefore, that in the administration of these estates, this court must necessarily seek the understanding and co-operative support of the Bar in rendering services to quasi- *942 destitute incompetents, for such fees as are reasonably available under the circumstances, as well as in those proceedings where the incompetents are more abundantly endowed financially and whose estates, therefore, are in a better position to support more appropriate fees.
The determinations of this court as originally made are in all respects adhered to.